UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**HABITAT EDUCATION CENTER, INC.,**
**DAVID ZABER and RICARDO JOMARRON,**
        **Plaintiffs,**

      **v.**                       **Case No. 03C1024**

**DALE BOSWORTH, as CHIEF**
**OF THE U.S. FOREST SERVICE,**
**MIKE JOHANNS, as SECRETARY**
**OF THE UNITED STATES**
**DEPARTMENT OF AGRICULTURE,**
        **Defendants.**

---

## DECISION AND ORDER

      Plaintiff Habitat Education Center, Inc., a citizen's organization engaged in forest, wildlife, and natural resource protection, and two of its officers, bring this action against defendants, Dale Bosworth, Chief of the United States Forest Service, and Mike Johanns, Secretary of the United States Department of Agriculture (collectively the "Forest Service").[1]  Plaintiffs allege that in approving logging activities and timber sales in the Cayuga area of the Chequamegon-Nicolet National Forest ("CNNF") in northern Wisconsin, the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1687.

      Plaintiffs contend that the Forest Service violated NEPA by: (1) failing to consider the cumulative impacts on the environment of past, present and reasonably foreseeable

---

[1]Defendant Johanns recently succeeded Ann Veneman as Agriculture Secretary. I have amended the caption to reflect this change.

future logging projects, and (2) failing to consider sound, high quality scientific information indicating that the project will harm several species inhabiting the CNNF.  Plaintiffs contend that the Forest Service violated NFMA by: (1) approving the project based on an outdated 1986 forest plan, and (2) failing to monitor the populations of certain management indicator species.

Plaintiffs bring the action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which permits persons who are adversely affected by the action of a federal agency to obtain judicial review of such action.  See Sierra Club v. Marita, 46 F.3d 606, 610 n.3 (7th Cir. 1995).  Plaintiffs have standing to sue because they allege that the actions complained of will diminish their use and enjoyment of the CNNF.  See Rhodes v. Johnson, 153 F.3d 785, 787 (7th Cir. 1998).  Before me now are the parties' cross-motions for summary judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The CNNF comprises two areas, the Chequamegon, which covers 858,400 acres in northwestern and north-central Wisconsin, and the Nicolet, which covers 661,400 acres in northeastern Wisconsin.  Prior to 1993, the Forest Service managed the areas separately but has since has treated them as a single unit.  In 2001, the Forest Service commenced the process of preparing an environmental impact statement ("EIS") concerning the Cayuga project on the Chequamegon side of the CNNF.  On May 7, 2003, the District Ranger signed a record of decision ("ROD") for the project and released the final EIS.  The District Ranger selected the fifth of five alternative approaches because it

> 1. Provid[es] breeding, foraging areas and dispersal habitat for pine marten by managing for a contiguous block of northern hardwoods across the northern portion of the project area; 2. Result[s] in a lower level of

2

fragmentation that would reduce the potential for predation on forest interior migratory birds; and 3. Protect[s] lowland areas from potential impacts of clearcutting and temporary road construction.

(R. 5 at 7.) Plaintiffs administratively appealed unsuccessfully, and the parties' attempt to resolve the dispute informally also failed.

In 2003, the Forest Service also approved five other timber sales in the CNNF, three on the Chequamegon side, the Gilman Tornado, Hoffman Sailor and Sunken Moose sales, and two, the McCaslin and Northwest Howell sales, on the Nicolet side. On April 30, 2004, the Forest Service released the 2004 forest plan for the CNNF, and it became effective in June 2004.

I will state additional facts in the course of the decision.

## II.  STANDARDS OF REVIEW

As stated, the parties cross-move for summary judgment under Fed. R. Civ. P. 56. However, in cases like the present one in which a district court reviews the action of an agency and thus performs an essentially appellate function, a summary judgment motion is an imperfect vehicle.  See Primeco Pers. Commc'ns, Ltd. P'ship v. City of Mequon, 242 F. Supp. 2d 567, 574 (E.D. Wis. 2003) (noting that in cases involving review of municipal decisions under the Telecommunications Act, "district courts sit in an appellate capacity, much as in Social Security cases where they review the decisions of administrative law judges"); see also Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1501 (10th Cir. 1992) (Kane, J., concurring) (pointing out that summary judgment motions in social security cases are unnecessary); Vaile v. Chater, 916 F. Supp. 821, 823 n.2 (N.D. Ill. 1996) (treating the Commissioner's motion for summary judgment in a Social Security case as a motion to affirm the Commissioner's decision).

3

The purpose of a summary judgment motion is to determine whether a case should proceed to trial, but in a case where a court reviews an agency decision, the "trial," such as it was, has already taken place. Further, in the present case, the standard of review is not whether there is a genuine issue of material fact, as it is under Rule 56, but whether the agency's decision was "arbitrary and capricious." See e.g., Env't Now! v. ESPY, 877 F. Supp. 1397, 1421 (E.D. Cal. 1994) (noting that when the court reviews an agency decision "[t]he question is not whether there is a genuine issue of material fact, but whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole").

The Federal Rules do not seem to provide an appropriate mechanism for challenging an agency's decision. Nevertheless, I believe that a simple motion stating the relief requested is sufficient. Thus, I will treat plaintiffs' motion as one to reverse the Forest Service's determinations and the Forest Service's cross-motion as one to affirm such determinations. See Habitat Educ. Ctr., Inc. v. Bosworth, 363 F. Supp. 2d 1070, 1074 (E.D. Wis. 2005) (treating motions for summary judgment as motions to reverse and to affirm); Habitat Educ. Ctr., Inc. v. Bosworth, 363 F. Supp. 2d 1090, 1095 (E.D. Wis. 2005) (same).

I review challenges to agency action under NEPA and NFMA under the standard provided in the APA. See Highway J Citizens Group v. Mineta, 349 F.3d 938, 952 (7th Cir. 2003) (reviewing NEPA claim); see also Ind. Forest Alliance, Inc. v. U.S. Forest Serv., 325 F.3d 851, 859, 862 (7th Cir. 2003) (reviewing NFMA claim). Under such standard, I may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by

4

law." 5 U.S.C. §§ 706(2)(A), 706(2)(D). This standard of review is narrow and requires that I "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." Highway J Citizens Group, 349 F.3d at 952-53 (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989)) (internal quotations omitted). I may not substitute my judgment regarding the environmental consequences of an action for that of the agency. Id. at 953. However, I must "insure that the agency has taken a 'hard look' at environmental consequences." Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976). Thus, if

> an agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]

the agency has violated the APA. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

When interpreting NEPA, I must give "substantial deference to the regulations issued by the Council on Environmental Quality" ("CEQ"). Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003) (citing 42 U.S.C. § 4342). "The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted 'to the fullest extent possible' in accord with the policies embodied in the Act." Id. (citing 42 U.S.C. § 4332(1) and California v. Block, 690 F.2d 753, 769 (9th Cir. 1982)). "Grudging, pro forma compliance will not do." Id. (citation omitted).

A plaintiff challenging agency action under NEPA and NFMA bears the burden of proof. Marita, 46 F.3d at 619. Finally, in reviewing agency action under the APA, I "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The scope of review

5

is thus necessarily limited to the administrative record before the agency decisionmaker. Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985).

### III.  NEPA CLAIMS

Congress enacted NEPA to foster better decisionmaking and informed public participation in actions that affect the environment.  42 U.S.C. § 4321 et seq.  To achieve this goal, NEPA requires that federal agencies, such as the Forest Service, prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The EIS must include a "detailed statement" concerning "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided" and alternative proposals that could minimize the adverse impacts or enhance the quality of the environment. Id. Finally, the EIS must include an analysis of the "relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity" and a list of "any irreversible and irretrievable commitments of resources which would be involved in the proposed action" if it were implemented. Id. NEPA requires analysis and public disclosure of significant environmental effects in order to ensure informed public decisionmaking, but it does not require that agencies select any particular decision.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).

### A.  Cumulative Impacts Analysis

As noted above, NEPA requires agencies to prepare EISs in anticipation of significant federal actions.  42 U.S.C. § 4332(2)(C).  The CEQ regulations implementing NEPA provide that an EIS shall include a discussion of environmental impacts, including

6

impacts that are direct, indirect and cumulative.  40 C.F.R. § 1508.25.  The regulations define "cumulative impact" as

> the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  Plaintiffs allege that the Forest Service failed to adequately analyze the cumulative impacts of the Cayuga timber sale by: (1) unreasonably choosing the geographic area in which to conduct the cumulative impacts analysis; (2) failing to evaluate the effects of the five other timber sales that it approved; and (3) failing to analyze the cumulative impacts in sufficient detail and with sufficient specificity.  I address these contentions below.

**1.     Determination of Geographic Area in Which to Analyze Cumulative Impacts**

The "identification of the geographic area" within which a project's cumulative impact on environmental resources may occur "is a task assigned to the special competency of the appropriate agencies."  Kleppe, 427 U.S. at 414; see also Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059 (9th Cir. 2002) (noting that the court should defer to an agency's determination of the scope of its cumulative impact review).  Nevertheless, "the choice of analysis scale must represent a reasoned decision and cannot be arbitrary." Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002).  Thus, "[a]n agency must provide support for its choice of analysis area and must show that it considered the relevant factors." Native Ecosystems Council v. Dombeck, 304 F.3d 886, 902 (9th Cir. 2002).  Relevant factors include "the scope of the project considered, the

7

features of the land, and the types of species in the area." Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944, 958 (9th Cir. 2003). The presence of species habitat outside the project area is also a relevant consideration in determining the geographic scope of a cumulative impacts analysis for wildlife. Council on Environmental Quality, Considering Cumulative Effects Under the National Environmental Policy Act 15 (January 1997), available at http://ceq.eh.doe.gov/nepa/ccenepa/sec2.pdf (last viewed July 14, 2005). Thus, NEPA requires an agency to explain in the EIS how it chose the geographic area in which it conducted the cumulative impacts analysis and demonstrate that in making such choice it considered the relevant factors.

In the present case, plaintiffs allege that the Forest Service improperly limited the geographic scope of the area in which it conducted the cumulative impacts analyses for northern goshawk[2], red-shouldered hawk[3], and American marten,[4] each of which the Regional Forester designated Regional Forester Sensitive Species ("RFSS").[5] However,

_____

[2]The northern goshawk is an uncommon to rare bird, which is found in small numbers in forests. It is approximately twenty-one inches long and has a forty-one inch wing span. It nests in tall trees and feeds mainly on grouse, rabbits and squirrels. David Allen Sibley, The Sibley Field Guide to Birds of Eastern North America, 96 (2003).

[3]The red-shouldered hawk is an uncommon bird found in mature lowland forests. It is about seventeen inches long and has a forty inch wing span. It nests in tall trees, and feeds mainly on reptiles, amphibians, small mammals and birds. Sibley, supra, at 100.

[4]The American marten is a member of the weasel family. It is approximately six inches tall and between eighteen and twenty-five inches in length. It lives in mature, dense conifer forests or mixed conifer-hardwood forests, and is mostly carnivorous. Wisconsin Department of Natural Resources, American Marten (Martes Americana), at http://www.dnr.state.wi.us/org/land/er/factsheets/mammals/Marten.htm (last modified Oct. 19, 2004).

[5]RFSS are "those plant and animal species identified by a Regional Forester for which population viability is a concern as evidenced by: (a) significant current or predicted

nowhere in the record does the Forest Service make clear exactly what geographic area it chose to conduct the above cumulative impacts analyses within. Neither in the EIS nor in the related Biological Evaluation ("BE") does the Forest Service clearly identify such area. The EIS and BE state only that the agency conducted the analyses in an area "within and near the project area." (R. 2258); (R. 4, App. D at 12, 14.)

Putting aside the question of the area in which the Forest Service actually conducted the analyses, the agency should have disclosed in the EIS how it chose such area, and by failing to do so, it violated the requirements of NEPA. Neither in the EIS nor the BE does the agency discuss the choice of area issue at all much less demonstrate that it made a reasoned decision and considered all of the relevant factors. Rather, it appears that the Forest Service overlooked the issue altogether. NEPA requires the Forest Service to put the issue on the table so that it and the public can scrutinize its decision and consider alternative approaches. By failing to do so, the agency impeded informed decision-making and deprived the public of an opportunity to comment on the issue and thus assist in the decision-making process. See Lands Council v. U.S. Forest Serv., No. 03-35640, 2004 U.S. App. LEXIS 27583, at * 11 (9th Cir. Aug. 13, 2004) (stating that NEPA requires a sufficiently detailed statement of alternatives so as to permit informed decisionmaking"); see also DuBois v. U.S. Dep't of Agric., 102 F.3d 1273, 1285-86 (1st Cir. 1998) (explaining that EISs promote NEPA's purposes by making information "available

---

downward trends in population numbers or density; or (b) significant current or predicted downward trends in habitat capability that would reduce a species existing distribution." (Forest Service Manual § 2670.5(19)); (R. 4, App. D at 1.)

to the public, which may then offer its insight to assist the agency's decision-making through the comment process").

The Forest Service's failure to discuss the issue of the geographic area in which to conduct the cumulative impacts analyses is particularly significant in the present case because such failure prevented the public from knowing whether the agency considered including in the analyses the effects of the five other timber sales that it approved roughly contemporaneously with the Cayuga project. As previously noted, in determining the geographic scope of the area in which to conduct a cumulative impacts analysis for wildlife, an agency should consider the presence of and possible effect on species outside the project area. Considering Cumulative Effects, supra, at 15. It is undisputed that wildlife, such as the red-shouldered hawk, goshawk, and marten reside in habitat scattered throughout the CNNF. Therefore, in choosing the geographic area in which to conduct the cumulative impacts analyses, the Forest Service should have treated the five other timber sales as relevant factors. However, there is no evidence in the record that it did so.

### 2. Consideration of Impact of Five Other Projects

The requirement that the Forest Service discuss in the EIS the cumulative impacts on the environment prevents it "from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." Natural Res. Def. Council, Inc. v. Hodel, 865 F.2d 288, 297 (D.C. Cir. 1988) (citations omitted). Thus, courts have held that the Forest Service must analyze the cumulative impact of contemporaneous sales or activities within a region. See, e.g., Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1306-08 (9th Cir. 2003); Native Ecosystems Council, 304 F.3d at 896; City of Tenakee Springs v. Clough, 915 F.2d 1308,

10

1313 (9th Cir. 1990). Plaintiffs argue that the Forest Service should have considered the Cayuga project's and the other five projects' impact on wildlife in the entire region in which the projects were to occur. However, I may not decide this issue because doing so would require me to determine the appropriate geographic area in which the agency should conduct the analyses, a decision that the Forest Service should appropriately make after considering all of the relevant factors and applying its expertise. See Marita, 46 F.3d at 619 (noting that "[t]he court is not empowered to substitute its judgment for that of the agency").

### 3. Sufficiency of Cumulative Impacts Analyses

A cumulative impacts analysis must be sufficiently detailed to be "useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts and must rely on some quantified or detailed information." Lands Council v. Vaught, 198 F. Supp. 2d 1211, 1245 (E.D. Wash. 2002). Without quantified or detailed information, "neither the courts nor the public, in reviewing the Forest Service's decisions, can be assured that the Forest Service provided the hard look that it is required to provide." Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1379-80 (9th Cir. 1998). "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." Id. at 1380. In the present case, plaintiffs allege that insofar as they relate to goshawk, red-shouldered hawk and marten, the cumulative impacts analyses are inadequate because they consist only of unsubstantiated generalizations and vague references.

11

The Forest Service responds that the amount of detail required by NEPA varies according to the amount of harm that a proposed project may cause and that it did not have to include a high level of detail in the EIS because the Cayuga project will not cause severe environmental harm.  See Block, 690 F.2d at 761 (holding that the "detail that NEPA requires in an EIS depends upon the nature and scope of the proposed action"); Nucleus of Chi. Homeowners Ass'n v. Lynn, 524 F.2d 225, 231 (7th Cir. 1975) (noting that the "content and volume of" the record required to support a decision not to prepare an EIS "depend[s] upon the particular Federal action proposed"); see also Coalition on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 67 (D.C. Cir. 1987) (noting "[i]t is of course always possible to explore a subject more deeply and to discuss it more thoroughly.  The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts").

Regardless, however, of the extent of environmental harm that a proposed action may cause, the cumulative impacts analysis must satisfy a minimum standard, i.e., it must provide sufficiently specific information to assure the public that the agency took a hard look at a project's potential cumulative environmental effects.  Lands Council v. Powell, 379 F.3d 738, 745 (9th Cir. 2004) (noting that "the general rule under NEPA is that in assessing cumulative effects, the [EIS] must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment").  In other words, the EIS must "provide decisionmakers with sufficiently detailed information to aid in determining whether to proceed with the action in light of its environmental consequences and to provide the public with information and an opportunity to participate

12

in the information gathering process." N.W. Res. Info. v. Nat'l Marine Fisheries Serv., 56

F.3d 1060, 1064 (9th Cir. 1995); see also Young v. Gen. Serv. Admin., 99 F. Supp. 2d 59,

67 (D.D.C. 2000) (holding that "[i]n addition to providing crucial information to the agency,

NEPA also guarantees that the relevant information will be made available to the larger

audience that may also play a role in both the decision making process and the

implementation of that decision.  This larger audience includes . . . the public, which

receives the assurance that the agency has indeed considered environmental concerns

in its decisionmaking process as well as the opportunity to comment.").  Thus, an agency

must demonstrate in the EIS that it took the required hard look at the potential

environmental consequences of a proposal and then may or may not provide additional

detail as it deems appropriate.

> a.  **Northern Goshawk**

After noting that there is a debate concerning whether goshawk productivity is falling

or rising and discussing goshawk habitat needs, the Forest Service states in the cumulative

effects analysis regarding goshawk:

> Although one active territory was discovered during the 2001 season, many
> of the stands thought to have the highest potential for goshawk activity were
> found to be relatively low quality habitat, due to lack of species diversity
> (primarily lack of mature conifer component) and lack of structural features
> (Tom Doolittle, Bad River Band of Lake Superior Chippewa biologist,
> contract surveyor-pers. comm.).  Much of the hardwood forest within the
> project area, while considered silviculturally mature, is still a relatively young,
> recovering forest, with even-age structure, and lacking quality cover, nest
> sites, and foraging habitat.  In time, these forests should grow to be better
> nesting habitat.  Proposed hardwood management, together with future
> management, can have the effect of temporarily reducing habitat quality
> further; however, the increased growth and species diversity that can result
> from management should have a long-term effect of at least maintaining
> habitat quality, or improving it.  Any known nest sites have been, and will
> continue to be protected from disturbance.

Case 2:03-cv-01024-LA   Filed 08/08/05   Page 13 of 37   Document 82

Portions of the project area have been heavily managed towards aspen. These same areas are also proposed for more clearcutting in this project. For this reason, these areas may continue to be less than optimal habitat, due to the lower percentage of mature forest type, and the general fragmentation of habitat.

(R. 4, App. D at 16.)

The above analysis does not satisfy the requirements of NEPA because it provides insufficient detail to demonstrate that the Forest Service took a hard look at the cumulative effects of past, present, and reasonably foreseeable future logging projects on goshawk. Although the forest Service acknowledges the low quality of goshawk habitat in the area, it does not analyze whether past logging and road construction contributed to such low quality. Additionally, the agency suggests that, over time, "these forests should grow to be better nesting habitat," (R. 4, App. D at 16), but it provides no meaningful information with respect to when or what quantity of habitat might improve. Moreover, while acknowledging that management activities can reduce habitat quality "temporarily," the Forest Service provides no information concerning the duration of such temporary impact or the extent of the impact. The Forest Service also does not provide information about the amount of past logging in goshawk habitat, when logging occurred and what impact it had both on the habitat and goshawk. As explained above, the goshawk is an RFSS and thus, it is particularly important that the Forest Service present a reasonably detailed cumulative impacts analysis. However, for the reasons stated, the analysis is insufficiently detailed and is not "useful to the decisionmaker in deciding whether or how to alter the program to lessen cumulative impacts." Lands Council, 198 F. Supp. 2d at 245. Further, the agency does not explain why it could not provide more detailed information. See Neighbors of Cuddy Mountain, 137 F.3d at 1380 ("General statements about 'possible' effects and

14

'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided.")

The Forest Service argues that in determining the adequacy of the cumulative impacts analysis, I should consider information relating to goshawk in the administrative record. (See R. 3888) (providing a more detailed analysis of the cumulative effects on goshawk and concluding that the Cayuga project will result in less than one percent reduction in habitat.) However, I may not do so because documents in the administrative record cannot cure deficiencies in the EIS. Grazing Fields Farm v. Goldschmidt, 626 F.2d 1068, 1069 (1st Cir. 1980). Finally, the Forest Service argues that the cumulative impacts analysis for goshawk is sufficient if considered in conjunction with other sections of the EIS. However, the other sections do not cure the deficiencies of the analysis because they do not specifically discuss cumulative effects in relation to goshawk. (See R. 4 at 50) (discussing past harvests); (R. 4 at 93) (discussing the effects of past aspen management); (R. 4 at 107) (discussing the effects of past harvesting on fragmentation).

> **b. Red-shouldered hawk**

Insofar as it relates to the red-shouldered hawk, the cumulative effects analysis states:

> There are even fewer records of red-shouldered hawk activity on the Great Divide district than goshawk activity, with the reasons not fully known. This area is reaching the edge of the range for the bird, with known nest sites within the Forest dropping off from south to north, and more sites known from the Nicolet than the Chequamegon land base. S[pecies] V[iability] E[valuation] data suggests that a viable population is likely on the Nicolet, but not on the Chequamegon.

> With this background, it is difficult to assess the cumulative effects of any project on the red-shouldered hawk. What can be said is that the quality of habitat from this project and other similar projects in the area will essentially

15

maintain the necessary habitat requirements in the short-term, and possibly improve habitat over the long term, due to potential for reduction of aspen management in the northern portion of the project area, and gradual growth and maturing of the hardwood forests, with resulting improved structure.

(R. 4, App. D at 17.)

The above discussion lacks sufficient detail to demonstrate that the Forest Service took the "hard look" required by NEPA. The Forest Service notes that despite potential habitat in the area, there is little red-shouldered hawk activity, but it does not attempt to discuss the reasons for the lack of activity, including whether past logging played a role and, if so, to what extent. Rather, the Forest Service states only that the reasons are "not fully known." Moreover, it offers no quantified or detailed information about the impacts of past projects on the population of red-shouldered hawk or its habitat or about the amount of suitable habitat that remains. Further, the Forest Service does not explain why the analysis does not include such information. Like the goshawk, the red-shouldered hawk is an RFSS. Thus, it is critical that the Forest Service satisfy its obligation under NEPA to take a hard look at cumulative effects. For the reasons stated, it has not done so.

The Forest Service again argues that in determining the adequacy of the cumulative impacts analysis I should consider information relating to red-shouldered hawk in the administrative record. (See R. 3894) (explaining that there will be "no cumulative effect to occupied habitat and no impact on individual [red-shouldered] hawks"). However, I may not do so because documents in the administrative record cannot cure deficiencies in the EIS. Grazing Fields Farm, 626 F.2d at 1069. Other sections of the EIS also fail to remedy the deficiencies because they do not specifically discuss cumulative impacts in relation to red-shouldered hawk. (See R. 4 at 50, 93, 107.)

16

### c. American marten

Plaintiffs argue that the cumulative impacts analysis relating to the American marten, also an RFSS, is insufficient.  Such analysis states:

> Past management within and near the project area, combined with proposed activities and possible future activities, will likely maintain a fragmented condition, with a relatively high aspen component, in the southern portion of the project area.  This would have the effect of making the area less suitable for marten use, and/or reducing the possibility of dispersal to other areas further south and east.  The northern portion of the project area however (roughly the northern half of the project area, but especially north of F[orest] R[oad] 184) has been managed recently to stress interior hardwood forest; all of the alternatives except Alternative 3 would maintain this emphasis. This would provide an extensive area of continued marten habitat, and would maintain the area as a potential dispersal corridor to the east.

(R. 4, App. D at 13.)

Like the cumulative effects analysis relating to red-shouldered hawk and goshawk, the above analysis is so general that it fails to demonstrate that the Forest Service took a hard look at the potential cumulative effects on marten.  The analysis indicates that logging and associated activities can harm marten but provides no quantification or detailed supporting information.  For example, the Forest Service acknowledges that 45 timber sales have occurred in the project area since 1973, (R. 4 at 50), and indicates that such logging may make habitat "less suitable" for marten, (R. 4, App. D at 13), but does not indicate how much or what type of logging occurred in marten habitat or what effects it had. Nor does the analysis indicate how much suitable habitat remains.  Moreover, the Forest Service does not adequately analyze the impacts of logging on the marten's ability to expand its habitat in the CNNF.  The agency states that logging in the southern portion of the Cayuga would "reduce the possibility" of dispersal to the south and east, and that logging in the northern area would maintain a "potential" dispersal corridor to the east, but

17

it does not discuss whether the marten could in fact expand its habitat and whether marten could actually use the corridor to the east. Finally, the Forest Service suggests that it has attempted to develop interior hardwood forests in the northern portion of the Cayuga project area to provide additional marten habitat, but provides no information about whether it has succeeded in creating suitable habitat for the marten. In sum, the agency again analyzes cumulative impacts at an extremely high level of generality. It provides insufficient information to demonstrate that it took a hard look at the impacts of the project on marten. Thus, the analysis does not satisfy NEPA. Contrary to the Forest Service's assertions, other sections of the EIS do not remedy the deficiencies in the cumulative effects analysis for marten because they do not specifically discuss cumulative effects in relation to marten. (See R. 4 at 50, 93, 107.) Finally, I may not remedy a deficiency in the EIS by using information in the administrative record. See Grazing Fields Farm, 626 F.3d at 1069.

## B.    Scientific Information

Agencies "shall discuss at appropriate points in the final statement any responsible opposing view . . . and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b). If there is high quality information that opposes the agency's conclusions, the agency must make "a good faith reasoned response to it." Seattle Audubon Soc'y v. Lyon, 871 F. Supp. 1291, 1318 (W.D. Wash. 1994); see also Seattle Audubon Soc'y v. Espy, 998 F.2d 699, 704 (9th Cir. 1993) (finding that the Forest Service was required to address in the final EIS scientific criticisms opposing evidence upon which the final statement's management strategy rested). In making decisions, agencies must also rely on "high quality" information. See 40 C.F.R. § 1500.1(b). In the present case,

18

plaintiffs allege but do not establish that the Forest Service failed to satisfy these requirements.

Plaintiffs contend that the Forest Service did not consider and respond to scientific information concerning the viability of goshawk in the CNNF. They first argue that the agency failed to consider data indicating that logging can substantially reduce the productivity of goshawk nests. (R. 2574-75) (explaining that some research shows a 94% decrease in nest productivity in treated stands). However, the EIS acknowledges the possibility that logging may reduce the productivity of nests. (See R. 4, App. D at 15) (recognizing that logging may "have detrimental effects on the territory, likely leading to abandonment of the nest" and that "harvest in the closest stands would potentially affect the quality of the nesting area habitat, by reducing canopy closure and potentially increasing the chance for predation").

Plaintiffs also contend that the Forest Service ignored studies conducted by Dr. Tom Erdman and Dr. Tom Doolittle indicating that logging can negatively affect goshawk viability. (See R. 4959) (noting that forty-three percent of goshawk territories in northern Wisconsin had been cut, and that "cutting is a serious problem"); (see also R. 4957-62) (noting that nests in logged areas were not reoccupied by goshawks). However, the Forest Service generally recognizes that logging is harmful to goshawk and its habitat. (See R.4, App. D at 15) (outlining a variety of harmful effects to goshawk caused by logging). Additionally, the Forest Service acknowledges that the goshawk is an RFSS and the issue of goshawk viability, but disagrees that the Cayuga project will contribute to the problem. (R. 4 at 145) (noting that the Cayuga project "may impact individual[]" goshawk, but it is "not likely to cause a trend to federal listing or loss of viability"). Moreover, even if the

19

Forest Service failed to address Erdman's and Doolittle's conclusions, Erdman's and Doolittle's studies do not directly consider whether the Cayuga project will threaten goshawk viability and thus do not require a direct response.

Plaintiffs also argue that the Forest Service failed to consider the possibility that increased fragmentation would increase the abundance of predators and thereby imperil goshawk viability. (See R. 2574-75.) However, the Forest Service considers the problem of predation caused by fragmentation in the EIS. (See R.4, App. D at 15) ("Selection cutting activities as proposed in Alternatives 2-4 could have temporary effects on potential habitat, by opening up the canopy of these stands sufficiently to reduce cover and increase competition or predation from great horned owls or red-tailed hawks."). Additionally, the Forest Service considered fragmentation when it chose the fifth of the Cayuga project alternatives. (See R. 5 at 7) (indicating that the Forest Service chose alternative 5 over the other alternatives because it "[r]esult[s] in a lower level of fragmentation that would reduce the potential for predation on forest interior migratory birds"). In sum, the Forest Service did not fail to address the scientific information relating to goshawk.

Plaintiffs also argue that the Forest Service failed to consider and respond to scientific information concerning the viability of red-shouldered hawk in the CNNF. For example, plaintiffs argue that the Forest Service ignored statements indicating concerns about the effects of logging on red-shouldered hawks. (See R. 2860) ("breeding habitat alteration appears to have been and probably continues to be the greatest threat to viable Red-shouldered Hawk populations"); (Northwest Howell R. 4056) (recommending "a complete ban on all logging for the next 100 years"). However, these statements do not apply specifically to the Cayuga project and thus do not require a response. Moreover, the

20

Forest Service acknowledges that the red-shouldered hawk is an RFSS and the issue of viability but disagrees that the Cayuga project will contribute to the problem. (See R. 4 at 145) (the Cayuga project will have "no impact" on red-shouldered hawk).

Plaintiffs also allege that the Forest Service failed to recognize the impact that fragmentation would have on red-shouldered hawk. However, as explained previously, the Forest Service took into account the problems caused by fragmentation in choosing to proceed with the fifth alternative. (See R. 5 at 7) (indicating that the Forest Service chose alternative five over the other alternatives because it "[r]esult[s] in a lower level of fragmentation . . .").

Additionally, plaintiffs claim that the Forest Service ignored information indicating that red-shouldered hawk nests are difficult to identify. (See R. 2872) ("even on Nicolet, where raptor biologists have been working intensely with Forest Service personnel for over 25 years, less than 25% of active nest sites have been identified"). Plaintiffs claim this information contradicts the conclusion that the Cayuga project would have no direct effects on red-shouldered hawk since red-shouldered hawk are not known to inhabit the project area. However, the information indicating that red-shouldered hawk nests are difficult to identify applies throughout the Nicolet forest generally, rather than to the Cayuga project area specifically. Thus, it does not contradict the Forest Service's conclusion that the Cayuga project would have no direct effects on red-shouldered hawk and did not need to be addressed. In sum, the Forest Service did not fail to address opposing scientific information relating to red-shouldered hawk.

Finally, plaintiffs contend that the agency relied on information that was not of high quality, i.e., the 1986 forest plan, which they assert is outdated. However, the record

21

indicates that in addition to considering information in the 1986 plan, the agency looked at a significant quantity of more recent information. (R. 4 at 11) ("the Cayuga action alternatives were developed by considering the new information and conditions used in developing the [Forest] Plan Revision alternatives); (see also Cayuga Project Planning Record Index at 11-21) (highlighting scientific literature published since the 1986 Plan was finalized and used in developing the Cayuga EIS). Therefore, the Forest Service did not violate NEPA in this respect.

## IV.  NFMA CLAIMS

NFMA governs the Forest Service's regulation of the national forest system.  16 U.S.C. §1600 et seq.  "NFMA requires the Secretary of Agriculture to develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System."  Biodiversity Assocs. v. U.S. Forest Serv., 226 F. Supp. 2d 1270, 1278 (D. Wyo. 2002); 16 U.S.C. § 1604.  Each forest plan governs the use of an individual forest and must fulfill the Forest Service's mandate to "provide for multiple use and sustained yield . . . includ[ing] coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1).  Furthermore, "[i]n developing the plans, the Forest Service must take both environmental and commercial goals into account." Biodiversity Assocs., 226 F. Supp. 2d at 1278 (quoting Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 729 (1998) (internal quotations omitted)).   The final plan divides a forest into management areas and stipulates how resources in each of these areas will be administered.  A forest plan must be revised when conditions in a forest "have significantly changed," but at least once every fifteen years. 16 U.S.C. § 1604(f)(5).  After creating a forest plan, the Forest Service implements it through consideration and adoption of

22

individual forest projects. 16 U.S.C. § 1604(i). Individual, site-specific projects must be consistent with the forest plan and are also subject to further analysis under NEPA. Id.

## A. Reliance on 1986 Plan

Plaintiffs claim that the Forest Service violated NFMA by analyzing the Cayuga project under the 1986 rather than the 2004 plan. They contend that new science and changed conditions caused the 1986 plan to become outdated. The agency responds that plaintiffs' claim is moot because it updated its analysis with a Supplemental Information Report ("SIR"), which found that "[w]ith minor adjustments to required features, the Cayuga ROD is consistent with all applicable standards and guidelines of the 2004 [plan]."[6] (Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. Ex. 1 at 1.) However, plaintiffs deny that the claim is moot, arguing that the 2004 plan is more environmentally friendly than the 1986 plan and that the agency could not have definitively determined whether the project was

_____

[6]Plaintiffs ask me to disregard the SIR because it is not part of the administrative record. However, in determining whether an issue is moot, I may consider documents that are not part of the administrative record. See Southern Utah Wilderness Alliance v. Smith, 110 F.3d 724, 729 (10th Cir. 1997) (noting that while documents outside the administrative record may not be used to determine the substantive issues in a case, they may be used in connection with the issue of mootness because "[b]y definition, mootness concerns events occurring after the alleged violation"). Thus, I will consider the SIR for the limited purpose of determining whether the issue is moot.

23

truly consistent with the 2004 plan's goals,[7] objectives,[8] standards[9] and guidelines,[10] merely by updating its analysis under the 1986 plan.  (See id. at 1) (noting that the SIR does not discuss "goals and objectives unless they relate to a substantial change in environmental impacts that were disclosed in the Cayuga" EIS). Rather, they assert that the Forest Service should have started from scratch and conducted a new analysis.

A case is moot when it no longer presents a live case or controversy.  See Bd. of Ed. of Downers Grove Grade Sch. Dist. No. 58 v. Steven L., 89 F.3d 464, 467 (7th Cir. 1996).  "Action by the defendant that simply accords all the relief demanded by the plaintiff" may render an issue moot. 13A Charles Alan Wright, et al., Federal Practice & Procedure § 3533.2, at 238 (2d ed. 1984 & Supp. 2004).  In other words, "[s]o long as nothing further would be ordered by the court, there is no point in proceeding to decide the merits." Id.  As the foregoing discussion indicates, plaintiffs' claim that the Forest Service erred in

_____

[7]Goals are "broad statements describing conditions the forests will strive to achieve" although there are "no specific time frames for achieving them."  (2004 LRMP at 1-1.)  In the 2004 plan, one of the goals is to "ensure healthy and sustainable ecosystems for endangered, threatened and sensitive species."  (Id. at 1-2.)

[8]Objectives are "time-specific statements of planned results or outcomes responding to established goals."  (2004 LRMP at 1-1.)  In the 2004 plan, one of the objectives is to "implement established recovery or conservation strategies" under the Endangered Species Act.  (Id. at 1-2.)

[9]A standard is a "course of action that must be followed, or a level of attainment that must be reached to achieve forest goals."  (2004 LRMP at 2-1.)  For example, one of the standards in the 2004 forest plan is to "[p]rotect hydrologic function and maintain natural hydrologic regimes."  (Id. at 2-3.)

[10]A guideline is also a "course of action that must be followed.  However, [g]uidelines relate to activities where site-specific factors may require some flexibility."  (2004 LRMP at 2-1.)  An example of a 2004 plan guideline is to "[e]nsure revegetation of log landings after project activities are completed, either through artificial means or natural revegetation."  (Id. at 2-2.)

24

approving the Cayuga project under the 1986 plan is not moot because the agency did not provide "all the relief demanded by plaintiff," id., i.e., it did not conduct a complete analysis of the project under the 2004 plan.

Therefore, I must address whether the Forest Service violated NFMA by analyzing the Cayuga project under the 1986 forest plan while revising that plan. Plaintiffs argue that § 1604(f)(5)(A), which requires a forest plan to "be revised . . . from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years," suggests that the Forest Service committed a violation. Section 1604(f)(5)(A) does not require the agency to cease forest management activities, including analyzing proposed timber sales while it is formulating a new forest plan. Moreover, other sections of NFMA, 16 U.S.C. §§ 1604(c) and 1604(i), reflect congressional intent to permit the Forest Service to manage a forest while it is revising its forest plan. Section 1604(c) provides that "[u]ntil such time as a unit of the National Forest System is managed under plans developed in accordance with this Act, the management of such unit may continue under existing land and resource management plans." 16 U.S.C. § 1604(c); see also Biodiversity Assocs., 226 F. Supp. 2d at 1302 (noting that "[w]hile 1604(c) was directed at governing the state of affairs at the time NFMA was enacted, it is evidence that Congress never intended that the statute and its provisions should have the effect of ceasing all operations in a National Forest when a plan was not . . . timely revised").

Further, § 1604(i) provides that:

> Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans. . . . When land management plans are revised, resource plans and permit contracts, and other instruments, when necessary, shall be revised as soon as practicable. Any revision in present

25

or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.

16 U.S.C. § 1604(i).  Thus, when the agency revises a forest plan, it must also revise resource plans and other instruments, including plans for timber sales that it approved under the old plan. Therefore, "Congress recognized that things should continue to progress while a plan is in the process of revision, and that planning is an ongoing process, where the circumstances continue to change" and that plans and documents that rely on a forest plan "shall continually be in flux as well."  Biodiversity Assocs., 226 F. Supp. 2d at 1302-03 (stating that "Congress did not intend that missed statutory deadlines within NFMA would halt all action on the National Forests"); see Pub. L. No. 108-108, § 320; 117 Stat. 1241 (2003) (providing where the agency violates § 1604(f)(5)(A), a court should order it to revise the forest plan rather than enjoin ongoing management of a forest); see also Sierra Club v. Bosworth, 352 F. Supp. 2d 909, 921 (D. Minn. 2005) (noting support for the proposition that a forest plan remains in effect until the effective date of its revision). Plaintiffs point out that the Biodiversity Associates court focused only on "the remedy for failure to revise the Plan within fifteen years," 226 F. Supp. 2d at 1301, whereas the present case involves a significant change in conditions in the forest.  However, no section of NFMA suggests that there should be a different remedy for failing to revise a plan within fifteen years and failing to revise a plan because of changed conditions.

Thus, the Forest Service did not violate NFMA by analyzing the Cayuga project under the 1986 plan and updating the analysis under the 2004 plan.

**B.     Failure to Collect Population Data for Management Indicator Species**

26

When the parties filed their briefs, regulations implementing NFMA required that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area," 36 C.F.R. § 219.19 (1999), and that to satisfy this requirement, the agency had to select and monitor certain species known as management indicator species ("MIS"), 36 C.F.R. § 219.19(a)(1) (1999). Species were selected as MIS "because their population changes [were] believed to indicate the effects" of proposed actions on other species. Id.; see also Utah Envtl. Cong., 372 F.3d at 1224 (noting that MIS serve as a "proxy for determining the effects of management activities on other species"). MIS allow the Forest Service "to thoroughly evaluate the effects of the [forest management] alternatives on fish and wildlife populations . . . without having to evaluate each species individually." Utah Envtl. Cong., 372 F.3d at 1224 (citing Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 762 (9th Cir. 1996)). After selecting MIS, the agency evaluated how proposed actions would affect them "in terms of both amount and quality of habitat and of animal population trends." 36 C.F.R. § 219.19(a)(2) (1999). In the present case, the agency chose the barred owl and pileated woodpecker to serve as MIS for red-shouldered hawk, goshawk, and marten.

Consistent with the above regulations, the 1986 forest plan required the agency to engage in various monitoring of populations of MIS including monitoring the "[a]mount of habitat available," and the "population trend" for pileated woodpecker and barred owl every 10 years. (R. 4937 at V-14.) Plaintiffs contend that the agency failed to carry out its monitoring duties because it did not "collect actual, quantitative population data for the project area." (Mem. in Support of Pls.' Mot. for Summ. J. at 34.) Plaintiffs argue that the Forest Service erred by estimating MIS population based on habitat availability data rather

27

than by going into the field and actually counting the birds. The agency disagrees, arguing first that in January 2005 it promulgated new regulations that replace in toto the regulations in effect when the parties filed their briefs, 70 Fed. Reg. 1023 (Jan. 5, 2005), and that it fully complied with the new regulations. Second, it contends that plaintiffs failed to exhaust administrative remedies in connection with their claim that the Forest Service failed to properly monitor the MIS population. Finally, it argues that plaintiffs' claim fails on the merits. I address only the Forest Service's exhaustion claim as I conclude it is dispositive.

The APA requires plaintiffs to exhaust available administrative remedies before bringing their grievances to federal court. 5 U.S.C. § 704 (setting forth the APA's exhaustion requirement); see also 7 U.S.C. § 6912(e) (requiring that plaintiffs "exhaust all administrative appeal procedures" before bringing an action against the Department of Agriculture); 36 C.F.R. Part 215 (establishing appeal procedures in cases involving the Forest Service and requiring exhaustion prior to judicial review); Darby v. Cisneros, 509 U.S. 137, 154 (1993) (holding that under the APA, exhaustion is a prerequisite to judicial review "when expressly required by statute or when an agency rule requires appeal before review" so long as the administrative action is made "inoperative pending that review"). The doctrine of exhaustion "cuts down on the work of the courts, preserves the integrity and autonomy of the administrative process, and ensures that when the administrative proceeding does come before the court, the court will have before it that mature, considered, and final articulation of the basis of the agency's action." Glisson v. U.S. Forest Serv., 55 F.3d 1325, 1327 (7th Cir. 1995) (citing McCarthy v. Madigan, 503 U.S. 140, 144 (1992)). In order to exhaust a claim, the claim "must be raised with sufficient

Case 2:03-cv-01024-LA   Filed 08/08/05   Page 28 of 37   Document 82

clarity to allow the decisionmaker to understand and rule on the issue raised." Idaho Sporting Cong., Inc., 305 F.3d at 965 (citing Native Ecosystems Council, 304 F.3d at 900); see also Kleissler v. U.S. Forest Serv., 183 F.3d 196, 202 (3d Cir. 1999) (holding that to exhaust a claim, "the claims raised at the administrative appeal must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide the same claims now raised in federal court"). Under the APA, claimants may use "general terms" rather than "precise legal formulations" in raising an issue. Idaho Sporting Cong., Inc., 305 F.3d at 965 (citing Native Ecosystems Council, 304 F.3d at 900). There is no "bright-line standard" as to when a claimant has raised a claim with sufficient clarity. Id. Rather, the clarity of a claim is determined on a case-by-case basis.

The claims that plaintiffs raised in their administrative appeal are not sufficiently similar to their claim that the Forest Service failed to monitor the populations of MIS to enable me to conclude that the agency "was on notice of, and had an opportunity to consider and decide the same claims now raised" in this suit. Kleissler, 183 F.3d at 202. In their administrative appeal, plaintiffs mentioned MIS only in passing; stating in the introduction to their appeal, incorrectly, that NEPA regulations require an agency to verify the viability of certain species by "in-the-field population counts of either the species or a representative species, known as a [MIS]."[11] (R. 4947.) Although plaintiffs stated that the agency could satisfy its monitoring duties by conducting in-the-field population counts of species or MIS, (id.), their appeal makes clear that their concern was that the Forest

_____

[11]As previously explained, NFMA regulations require an agency to monitor management indicator species. See 36 C.F.R. § 219.19 (1999).

29

Service had not monitored the species at issue, i.e., the goshawk, red-shouldered hawk or marten, rather than MIS. (See, e.g., R. 4963) (claiming that "the failure to address red-shouldered hawk viability in the context of site-specific analyses that use species-specific data on this threatened species is a clear violation of NEPA").

Plaintiffs also argue that the allegations in their administrative appeal that the Forest Service failed to ensure the viability of the red-shouldered hawk, goshawk and marten were sufficient to raise the monitoring claim. (See R. 4946, 4955-66) (alleging that timber sale endangered the survival of goshawk, red-shouldered hawk and marten). However, while claims may be raised in "general terms," Kleissler, 183 F.3d at 202, plaintiffs' allegations relating to species viability issues were too general to alert the Forest Service to the claim that it inadequately monitored the MIS populations. Plaintiffs' expression of concern about the agency's alleged failures to ensure the viability of red-shouldered hawk, goshawk and marten did not put the agency on notice of a claim that it should have conducted in-the-field population counts for MIS.

Plaintiffs also contend that a section in their administrative brief criticizing the Forest Service's reliance on the Breeding Bird Survey and claiming that it estimated MIS populations by using "unverified" models that "lack[ed] credible scientific support" put the agency on notice of the MIS monitoring claim. (R. 4951.) The section states:

> Discussion and analysis impacts to neotropical migratory species in the BE and FEIS are based upon unverified computer models and generic statements. Use of the Breeding Bird Survey data are not sufficient to substitute for site-specific monitoring. There are no site-specific data on these species, some of which are declining and there are no survey data provided in the FEIS or BE showing what numbers of sensitive species occur in these areas such that the agency can adequately determine that the proposal will not adversely affect the viability of these species. Unverified models of wildlife populations that lack credible scientific support (e.g. those

30

used to estimate MIS and neotropical migratory songbird populations in the project area) are not sufficient to understand site-specific impacts from the proposed activities.

(Id.)  However, the section's criticism of the Breeding Bird Survey specifically relates to "neotropical migratory" species, i.e., birds that breed north of the Tropic of Cancer and winter in Latin America and the Caribbean.  See  United States Fish & Wildlife Service, Division of Bird Habitat Conservation, Neotropical Migratory Bird Conservation, at http://www.fws.gov/birdhabitat/Nmbca/eng_birdlist.htm (last viewed July 21, 2005); see also 16 U.S.C. § 6101(1) (noting that neotropical migrants winter in Latin America and the Carribean).  Neither the barred owl nor the pileated woodpecker are neotropical migratory species.  Samuel D. Robbins, Jr., Wisconsin Birdlife: Population & Distribution, Past & Present 343, 373 (1991).

Moreover, plaintiffs' objection is too general to alert the Forest Service to a MIS monitoring claim because plaintiffs do not name the particular MIS of concern, i.e., the pileated woodpecker or the barred owl.  See Forest Conservation Council v. Jacobs, No. CIV.A.1:03-CV1230ODE, 2005 WL 1489962, at * 12 (N.D. Ga. June 16, 2005) (explaining that claims asserting data deficiencies for MIS are "only viable as to the species named in the administrative appeals").  Inasmuch as there are over twenty MISs, plaintiffs' general objections "cannot suffice to put the agency on notice about specific objections to the Forests Service's data on specific unnamed species," id., or "serve as a place marker so that [a plaintiff] might later look for data deficiencies to challenge in court."  Id.; see also Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 553 (1978) ("[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be'

31

considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination set aside in Court." ).[12]

Plaintiffs also argue that the following statements put the Forest Service on notice of their MIS monitoring claim: "As discussed in greater detail below, the proposed [Cayuga] timber sale as described in the ROD and EIS is completely inconsistent with these [NEPA] regulations relating to the effects on the northern goshawk, red-shouldered hawk, pine marten, Canada lynx, timber wolf, trumpeter swan, cerulean warbler, brown creeper, pileated woodpecker and other native vertebrates in the area, as well as members of the genus Botrichium and other listed plant species." (R. 4947.) However, this statement refers only to NEPA regulations rather than NFMA, which is the source of the MIS monitoring requirements. Moreover, the reference to "regulations" is not sufficiently specific to put the Forest Service on notice of the MIS monitoring claim.

For the foregoing reasons, plaintiffs did not raise the MIS monitoring claim "with sufficient clarity" to allow the Forest Service "to understand and rule on the issue raised." Idaho Sporting Cong., Inc., 305 F.3d at 965. Thus, plaintiffs did not exhaust such claim.

## VI. REMEDY

---

[12]Plaintiffs also allege that the Forest Service's response to the paragraph alleging that the models used to estimate MIS populations were "unverified" and "lack[ed] scientific support" indicates that the Forest Service was aware of the MIS monitoring issue. I disagree. In the Forest Service's response to this paragraph, the Forest Service stated that "[p]opulation trends for Management Indicator Species (MIS), including several neo-tropical migratory songbirds are discussed in Appendix H of the FEIS and in the cumulative effects summary of the wildlife specialists' report (pp. 46-50)." (See R. 5022.) This response suggests that the Forest Service was unaware of the monitoring issue with respect to the pileated woodpecker and the barred owl.

32

When a court finds that an agency has failed to satisfy the requirements of NEPA, it may but is not required to enjoin further action on the project under review. Wisconsin v. Weinberger, 745 F.2d 412, 428 (7th Cir. 1984) (rejecting presumption that injunction should issue upon a violation of NEPA). "Although the goal of NEPA is to force agencies to consider the environmental consequences of major federal actions, . . . that goal is not to be achieved at the expense of countervailing public interests." Id. at 426. Thus, "[t]raditional equity standards govern whether or not to grant injunctive relief in a NEPA case."[13] Heartwood, Inc. v. U.S. Forest Serv., 73 F. Supp. 2d 962, 977 (S.D. Ill. 1999). Generally, courts employ a four-factor balancing test to determine whether to issue an injunction, the elements of which are: (1) "that legal remedies are inadequate;" (2) "that not granting the injunction would result in irreparable injury;" (3) "that the balance of effects on each party of granting or not granting the relief weigh in favor of the movant;" and (4) "that the injunction is in the public interest." Leslye A. Herrmann, Injunctions for NEPA Violations: Balancing the Equities, 59 Univ. of Chi. L. Rev. 1263, 1271 (1992) (citing Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 542 (1987)).

In cases involving environmental injury, legal remedies are usually inadequate. See U.S. Envtl. Prot. Agency v. Envtl. Waste Control, Inc., 917 F.2d 327, 332 (7th Cir. 1990) (noting that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by

---

[13]But see Heartwood, Inc., 73 F. Supp. 2d at 978 (noting that the balancing test may not need to be used in NEPA cases because NEPA requirements implicate public health and when the issues in a case involve public health "injunctive relief is proper, without resort to balancing"); see also Sarah W. Rubenstein, Injunctions Under NEPA after Weinberger v. Romero-Barcelo and Amoco Production Co. v. Village of Gambell, 5 Wis. Evntl. L. J. 1 (1998) (indicating that the lower courts are not in agreement on whether to and how to apply the traditional equitable balancing test in NEPA cases).

Case 2:03-cv-01024-LA   Filed 08/08/05   Page 33 of 37   Document 82

money damages"). This is so in the present case. Money damages would not compensate for the loss of goshawk, red-shouldered hawk, marten and their habitat. Moreover, environmental injury is often irreparable. See id. (noting that environmental injury is "often permanent or at least of long duration, i.e., irreparable"). Courts have recognized that logging such as would occur as the result of the Cayuga timber sale can have long-term environmental consequences and thus satisfy the irreparable injury criterion. See Idaho Sporting Cong., Inc., 222 F.3d at 569 (noting that the imminent and continuing logging activities presented "evidence of environmental harm . . . sufficient to tip the balance in favor of injunctive relief"); Neighbors of Cuddy Mountain, 137 F.3d at 1382 (stating that "[t]he old growth forests plaintiffs seek to protect would, if cut, take hundreds of years to reproduce") (citation omitted).

However, an environmental injury must be sufficiently likely to occur for it to be considered "irreparable." If the environmental injury is sufficiently likely to occur, "the balance of harms will usually favor the issuance of an injunction to protect the environment." Idaho Sporting Cong., Inc., 222 F.3d at 569 (citing Amoco Prod. Co., 480 U.S. at 545). Thus, in the present case, the question of irreparable injury depends on the likelihood of the injury occurring. It is undisputed that the Forest Service plans to harvest within or near goshawk, red-shouldered hawk, and marten habitat and that some of this harvesting will negatively affect such habitat and the species. (See, e.g., R. 4, App. D at 13) (noting that logging may make certain areas less suitable for marten use). Thus, irreparable harm is sufficiently likely, especially when coupled with "the added risk to the environment that takes place when governmental decision makers make up their minds without having before them [a NEPA compliant] analysis . . . of the likely effects of their

34

decision upon the environment." Heartwood, Inc., 73 F. Supp. 2d at 978-79 (citing Conservation Law Found., Inc. v. Busey, 79 F.3d 1250, 1271-72 (1st Cir. 1996)).

Further, the relative absence of harmful effects on the Forest Service weighs in favor of granting the injunction. Although it will have to expend additional time, effort and resources in order to produce a NEPA compliant EIS, the Forest Service has presented no evidence that an injunction would result in excessive delay or excessive costs resulting from delay. Cf. Weinberger, 745 F.2d at 427 (implying that granting an injunction would be inappropriate because it would result in excessive delay in implementing a national defense project). Thus, the potential costs to the Forest Service in this case do not weigh heavily against an injunction.

Finally, paying "particular regard for the public consequences in employing the extraordinary remedy of injunction," I cannot conclude that the public interest weighs against issuing an injunction. Heartwood, Inc., 73 F. Supp. 2d at 962 (citing Weinberger, 745 F.2d at 425)). The public has an interest in both the issuance and the denial of the injunction. Courts have recognized that "it is not even arguable that violations by federal agencies of NEPA's provisions as established by Congress harm the public as well as the environment." Id. at 979; Fund for Animals, Inc. v. Espy, 814 F. Supp. 142, 152 (D.D.C. 1993) (noting that the public has an interest in compliance with the law as expressed by Congress). Additionally, in a case such as this, where goshawk, red-shouldered hawk, and marten and their habitat may be affected, the public's use, enjoyment and the health benefits of the lands and resources affected could be irreparably harmed. Heartwood, Inc., 73 F. Supp. 2d at 979. In contrast, the public also has an interest in agency efficiency and "avoiding unnecessary paperwork and agency man-hours" and may also have an economic

Case 2:03-cv-01024-LA   Filed 08/08/05   Page 35 of 37   Document 82

interest in the timber produced from the Cayuga sale. Agencies, however, "can find cost-effective methods of conducting their business and all can continue to operate" once the Forest Service issues an EIS that complies with NEPA. Id. at 980. Thus, the public's economic interest is not enough to prevent the issuance of the injunction. The potential irreparable injury to the public from allowing the Cayuga sale to proceed on the basis of an inadequate EIS is far greater than the potential harm to the public caused by issuing the injunction.

For the foregoing reasons, I will enjoin the Forest Service from implementing the Cayuga timber sale until it produces a NEPA compliant EIS.

## VII. ORDER

Therefore, as outlined above,

**IT IS ORDERED** that with respect to the sufficiency of the cumulative impacts analysis, plaintiffs' motion to reverse is **GRANTED,** and the Forest Service's motion to affirm is **DENIED**.

**IT IS ORDERED** that with respect to addressing opposing scientific information and analyzing the Cayuga project under the 1986 plan, the Forest Service's motion to affirm is **GRANTED,** and plaintiffs' motion to reverse is **DENIED**.

**IT IS ORDERED** that plaintiffs' claim relating to the Forest Service's failure to monitor MIS is **DISMISSED** for failure to exhaust their administrative remedies.

**FINALLY, IT IS ORDERED** that this case is **REMANDED** to the Forest Service for proceedings consistent with this opinion and that the Cayuga project is **ENJOINED** until such time as the EIS complies with NEPA.

36

Dated at Milwaukee, Wisconsin, this 5 day of August, 2005.

/s_____
LYNN ADELMAN
District Judge

37